**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA; the States of
CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, FLORIDA, GEORGIA, HAWAII,
ILLINOIS, INDIANA, IOWA, LOUISIANA,
MARYLAND, MASSACHUSETTS, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
HAMPSHIRE, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
TEXAS, VIRGINIA, WASHINGTON and
WISCONSIN, the DISTRICT OF COLUMBIA,
THE CITY OF CHICAGO and THE CITY OF
NEW YORK *ex rel.*, STEVEN M. CAMBURN,

        Plaintiffs and Relator,

vs.

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Defendant.

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730**

Civil Action No.

**JURY TRIAL DEMANDED**

---

## FALSE CLAIMS ACT COMPLAINT

The facts alleged in this *qui tam* Complaint establish that Defendant, Novartis

Pharmaceuticals Corporation, committed a massive fraud at the expensive of taxpayers with

regard to its sales and marketing of its drug, Gilenya, a multiple sclerosis ("MS") drug indicated

for the treatment of patients with relapsing forms of MS to reduce the frequency of clinical

exacerbations and to delay the accumulation of physical disability. Through a widespread

kickback campaign, Novartis took a relatively new MS drug, approved by the U.S. Food and

Drug Administration ("FDA") in September 2010, which was no more effective than existing

1

drugs, and fraudulently spun it into a blockbuster brand drug, with over $1.2 billion of sales in 2012.

## I.    **INTRODUCTION**

1.    On behalf of the United States of America ("United States"), the States of California, Connecticut, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington and Wisconsin (collectively, the "States"), the District of Columbia ("D.C."), the City of Chicago and the City of New York ("Cities") and, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA") and the False Claims Acts of the States, D.C., and the Cities, Plaintiff-Relator, Steven M. Camburn ("Plaintiff-Relator"), files this *qui tam* Complaint against Defendant, NOVARTIS PHARMACEUTICALS CORPORATION (hereinafter referred to as "NOVARTIS," "NPC," "Defendant," or the "Company").

2.    Plaintiff-Relator brings this action on behalf of the United States, the States, D.C., and the Cities against NOVARTIS to recover treble damages and civil penalties under the FCA and each of the States', D.C.'s, and the Cities' counterparts based on NOVARTIS' violations of the Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b(b), for paying kickbacks to doctors to induce them to prescribe Gilenya, which was reimbursed by federal health care programs. The States, D.C., and the Cities, along with the United States, are hereafter collectively referred to as the "Government."

2

3.　　　As set forth more fully below, from September 2010 through the present,

NOVARTIS systemically paid physicians that prescribed Gilenya to speak about and promote

the drug at "Patient Events" and "Peer-to-Peer" programs, which were often illegitimate

programs designed and executed to provide kickbacks to health care providers in the form of

speaker fees to induce them to write, and/or continue to write, prescriptions for Gilenya.

4.　　　NOVARTIS was well aware that its Patient Events and Peer-to-Peer programs

created opportunities to provide kickbacks to health care providers.

5.　　　By paying kickbacks to health care providers, NOVARTIS knowingly has caused

the submission of thousands of false claims for payment to Medicare, Medicaid, TRICARE®,

Veterans Administration Health Care and possibly other federally-funded government healthcare

programs (hereinafter referred to as "Government Healthcare Program(s)").

6.　　　These practices were widespread, egregious and orchestrated from the highest

levels of and within NOVARTIS.

7.　　　Incredibly, the Defendant in this case has already been apprehended and

sanctioned for the exact same type of misconduct at issue herein.  Specifically, in September

2010, the same month Gilenya was approved by the FDA, the Company publicly announced that

it had agreed to pay approximately $422 million in criminal and civil fines and penalties to

resolve claims that it had paid kickbacks to prescribers of Trileptal, Diovan, Zelnorm,

Sandostatin, Tekturna and Exforge, in addition to claims that the Company had promoted some

of these drugs for unapproved uses.  The first-filed *qui tam* case that led to the 2010 settlement

(the "2010 Settlement") was captioned as *U.S. ex. rel. Austin and Montgomery v. Novartis

Pharma. Corp.*, 03-CV-1551 (M.D. Fla.).  Notably, following the September announcement,

3

NPC continued and continues to engage in the same wrongful conduct that was the subject of the 2010 settlement.

## II.   THE PARTIES

8.     Defendant, NOVARTIS, is a subsidiary of Novartis AG, a world-wide pharmaceutical company engaged in the development, manufacturing, marketing and sale of pharmaceutical products.  It is domiciled in the State of New Jersey and does business throughout the United States, including in the Southern District of New York.  Upon information and belief, its parent corporation, Novartis Corporation, is located at 608 Fifth Avenue, New York, NY 10020, and it has offices at 25 Old Mill Road, Suffern, NY 10901.

9.     Plaintiff-Relator, Steven M. Camburn, is a current NOVARTIS sales representative.  Plaintiff-Relator was hired by NOVARTIS in August, 2010, shortly before Gilenya was approved by the FDA, and presently resides in Norristown, Montgomery County, Pennsylvania.  Prior to August, 2010, Plaintiff-Relator was employed as a sales representative by another major pharmaceutical company.

10.     Plaintiff-Relator has complied with all procedural requirements of the laws under which this case is brought.

11.     Plaintiff-Relator is informed and believes that the pervasive kickbacks and false claims alleged herein began in 2010 or 2011 and continue to date, notwithstanding the 2010 Settlement and Corporate Integrity Agreement ("CIA") that NPC entered into as part of the 2010 Settlement.

4

III.   **FEDERAL JURISDICTION AND VENUE**

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to
the state False Claims Acts pursuant to 28 U.S.C. § 1367.

13.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. §
3732(a) because Defendant can be found in, resides, or transacts business in this District.
Additionally, this Court has personal jurisdiction over Defendant because acts prohibited by 31
U.S.C. § 3729 occurred in this District.

14.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because
Defendant transacts business in this District and numerous acts proscribed by 31 U.S.C. § 3729
occurred in this District.

15.    Plaintiff-Relator's claims and this Complaint are not based upon allegations or
transactions which are the subject of a civil suit or an administrative civil money penalty
proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

16.    Plaintiff-Relator is the original source of the information upon which this
Complaint is based, as that phrase is used in the FCA and other laws at issue herein, including
the facts alleged in this Complaint.

17.    Plaintiff-Relator brings this action based on his direct knowledge and, where
indicated, on information and belief.  None of the actionable allegations set forth in this
Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

18.    At all times relevant hereto, Defendant acted through its agents and employees,
and the acts of Defendant's agents and employees were within the scope of their agency and

5

employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of Defendant.

## IV.    THE REGULATORY ENVIRONMENT

19.    Pursuant to the AKA, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.

20.    The AKA is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

21.    Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the AKA and other federal laws governing the provision of health care services in the United States.

22.    The AKA prohibits suppliers such as pharmaceutical manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

23.    A violation of the AKA is a violation of the FCA.

### A.    The FCA and the Medicare Fraud & Abuse/Anti-Kickback Statute

24.    The FCA provides that any person who knowingly presents, or causes another to present, a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A)&(B). The States, D.C., and the Cities that are parties to

6

this Complaint have enacted statutes with similar provisions to the FCA that similarly apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds.

25. The Medicare Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs and/or municipal programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to five years.

26. The Medicare Anti-Kickback statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

27. The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback statute to include administrative civil penalties of $50,000 for each violation, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

28. In accordance with the Medicare Anti-Kickback statute, applicable regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or

value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f). Thus, drug

companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to

induce physicians or others to order to recommend drugs that may be paid for by a federal health

care program. The law not only prohibits outright bribes and rebate schemes, but also prohibits

any payment by a drug company that has as one of its purposes inducement of a physician to

write additional prescriptions for the company's pharmaceutical products.

29.     Such remunerations are kickbacks when paid to induce or reward physicians'

writing of certain prescriptions. Kickbacks increase Government-funded health benefit program

expenses by inducing medically unnecessary overutilization of prescription drugs and excessive

reimbursements. Kickbacks also reduce a patient's health care choices, as physicians may

prescribe drug products based on the physician's own financial interests rather than according to

the patient's medical needs.

30.     The Medicare Anti-Kickback statute contains statutory exceptions and certain

regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See*

42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protect

NOVARTIS from liability for the conduct alleged herein.

31.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No.

111-148, § 6402(g), amended the Medicare Anti-Kickback statute (a/k/a "Social Security Act"),

42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be

enforced under the FCA. The PPACA also amended the Social Security Act's "intent

requirement" to make clear that violations of its anti-kickback provisions, like violations of the

8

FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

32.     As detailed herein, NOVARTIS devised a scheme whereby it paid kickbacks to health care providers in the form of massive amounts of cash and cash equivalents with the specific aim of artificially increasing the usage of Gilenya.

33.     Knowingly paying kickbacks to physicians to induce them to prescribe a prescription drug (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal Government healthcare program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA and similar state False Claims Acts.

**B.    Stark Law – The Medicare/Medicaid Self-Referral Statute**

34.     The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. §1395nn, *et seq*., also known as the "Stark Law," prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring Medicaid patients to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a non-exempt "financial relationship" with that manufacturer. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark Law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions. The Stark Law also prohibits payment of claims for prescriptions rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

35.     Knowingly paying physicians to induce them to prescribe a prescription drug for individuals seeking reimbursement for the drug from a federal health program or causing others

9

to do so, while certifying compliance with the Stark Law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA, as well as the state False Claims Acts.

36.     NOVARTIS' conduct alleged herein repeatedly violated the Stark Law, which in turn resulted in violations of the FCA, because NOVARTIS' unlawful payments and services to prescribing physicians induced (and still induces) those physicians to prescribe Gilenya, when they otherwise would not have done so. Many of those prescriptions were paid for by Government-funded health insurance programs.

    C.    **Medicare**

37.     Medicare is a federal program that provides federally subsidized health insurance primarily for persons who are 65 or older or disabled. *See* 42 U.S.C. §§ 1395 *et seq.* ("Medicare Program"). Part D of the Medicare Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 1108-173, to provide prescription drug benefits for Medicare beneficiaries. All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. The U.S. Department of Health and Human Services ("HHS"), through its component agency, the Centers for Medicare and Medicaid Services ("CMS"), contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

38.     Medicare enters into provider agreements with physicians to establish their eligibility to participate in the program. To be eligible for payment under the program, including

10

for prescriptions for pharmaceutical products, physicians must certify that they agree to comply with the AKA, among other federal health care laws.

39.    On the Medicare provider enrollment agreement, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me ... The Medicare laws, regulations and program instructions are available through the fee -- for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

***

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

CMS Form 855I.

40.    In addition, when pharmaceutical products are reimbursed under Medicare Part D, Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, the AKA. 42 C.F.R. § 423.505(h)(I).

41.    CMS regulations require that all subcontracts between Part D sponsors and pharmacies contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

11

### D.     Medicaid

42.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least fifty percent (50%) and is as high as eighty-three percent (83%).

43.     The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

44.     Claims arising from illegal kickbacks are not authorized to be paid under state regulatory regimes.  States also require certifications by physicians as a condition of providing Medicaid reimbursement for the prescriptions they write. These certifications include compliance with the AKA, among other federal health care laws.

12

45.     A provider who participates in the Medicaid program must sign an agreement with his or her state that certifies compliance with the state and federal Medicaid requirements, including the AKA. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

E.     **TRICARE**

46.     TRICARE, administered by the Department of Defense ("DOD"), is the United States military's health care system, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents. TRICARE operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.  Military prescription drug benefits are provided through three programs: military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

47.     TRICARE requires physicians to certify compliance with the AKA, among other federal health care laws.

V.     **GILENYA**

48.     Gilenya® (fingolimod) was FDA-approved in 2010.  It is an immunosuppressant that works by keeping immune cells trapped in your lymph nodes so they cannot reach the central nervous system.

13

49.     Gilenya is indicated for the treatment of patients with relapsing forms of MS to reduce the frequency of clinical exacerbations and to delay the accumulation of physical disability.  This medication will not cure MS, it will only decrease the frequency of relapse symptoms.

50.     Gilenya costs $60,000 per annum for patients and is a significant player in the $14 billion worldwide market for MS Drugs, $8.5 billion of which is spent in the United States alone.

51.     There are approximately 400,000 MS patients in the United States and a number of competitive products in the marketplace with similar or better efficacy than Gilenya. Although Gilenya was the first oral, once daily prescription, approved for use to treat MS, NOVARTIS markets and sells Gilenya in a highly competitive market with a number of competing products having been on the market for over a decade and other oral prescriptions having been recently approved by the FDA for sale in the United States.  Future sales of Gilenya are an important component of NOVARTIS' future growth strategy from a financial perspective.

52.     In 2011, NOVARTIS had gross sales of Gilenya just under $500 million.  In 2012, NOVARTIS sold over $1.2 billion in Gilenya and, in the first quarter of 2013, NOVARTIS sold over $235 million of Gilenya.  Although sales of Gilenya slowed after reports that the FDA and the European Medicines Agency were investigating 11 deaths associated with the use of Gilenya in 2012, NPC nevertheless expects to sell $2.1 billion annually in Gilenya by 2016.

53.     In 2013, NOVARTIS has established and communicated a net sales goal of $981 million for Gilenya.

14

54.     Gilenya's market growth is not a coincidence – it is the direct result of a pervasive illegal kickback scheme devised and carried out by NOVARTIS at the highest levels of the Company.

## VI.    SUBSTANTIVE ALLEGATIONS: KICKBACKS HAVE FUELED THE MARKET GROWTH OF GILENYA

### A.    Overview

55.     In January 2012, Plaintiff-Relator's region, Philadelphia, was assigned a new supervising manager, Vince Schaeffer, who, in addition to Philadelphia, now became responsible for the Wilkes Barre and Harrisburg territories as well. Mr. Schaeffer immediately rolled out his egregious kickback scheme by demanding that his territories, Philadelphia North and Philadelphia South, provide sixteen (16) "Patient Events" and eight (8) "Peer-to-Peer" programs per trimester and per territory. A Patient Event is an event, normally a desirable and expensive dinner, during which a health care provider, typically a high-volume prescription writing doctor, presents information about Gilenya to current and prospective patients. In contrast, a Peer-to-Peer event is an event amongst health care providers, also normally an expensive dinner or meal, during which a speaker, typically a high-volume, prescription writing doctor, presents information about Gilenya to his or her fellow colleagues.

56.     According to Mr. Schaeffer's mandate, this meant that, between the two territories in Philadelphia, the sales team was required to schedule 96 Patient Events and 32 Peer-to-Peer programs in 2012 alone – a shocking number that dwarfed the number of similar events conducted by competitors, which normally would not exceed five per annum for either event in the same geographical region.

15

57.    The practices that Mr. Schaeffer adopted in the Philadelphia region in 2012 were neither new nor unique to NPC.  Indeed, during 2011, according to co-workers of Plaintiff-Relator, Mr. Schaeffer engaged in similar practices in the Washington, D.C. area where he was stationed (and which led the nation at NPC in the scheduling of such events) and Mr. Schaeffer was lauded by NOVARTIS for his success in effectively operating a kickback scheme in which physicians were rewarded for writing Gilenya prescriptions through speaker fees that did not relate to legitimate or necessary events at which a pharmaceutical company could, in good faith, schedule a physician to speak with the actual goal of patient or physician education.

58.    In early 2012, members of Plaintiff-Relator's team expressed grave concern via conference calls and one-on-one conversations that the speaker program requirements being imposed by Mr. Schaeffer were excessive and unnecessary.  Despite the sales team's concerns, Mr. Schaeffer maintained this mandate.  Indeed, in performance reviews, including those of Plaintiff-Relator, evaluation was made of the number of Patient Events scheduled and the fact that Patient Events were less than expected was specifically documented as a metric upon which sales professionals were judged.

59.    Likewise, in 2012, NOVARTIS' Wilkes Barre and Harrisburg sales teams were required to complete 48 Patient Events each (for a total of 96 Patient Events between these two territories), which was, once again, an excessive and unnecessary amount of programs given the size of the respective regions and served only one true purpose – to reward physicians for writing Gilenya prescriptions through speaker fee kickback payments.

16

**B.    Excessive and Illegitimate Patient Events**

60.    By the end of 2012, the Philadelphia territories combined to complete a total of 80 Patient Events. This compared to nine Patient Events in the third trimester of 2011 (an annualized amount of 27 Patient Events), which, in and of itself, was an excessive amount – but paled in comparison to the Patient Events conducted in 2012. Although the Philadelphia territories did not meet Mr. Schaeffer's 2012 goal of 96 Patient Events, they nevertheless led the country in Patient Events in 2012, a year in which NPC actively promoted and pushed Patient Programs throughout the United States as a means to effectively compensate physicians for writing Gilenya prescriptions without regard for whether the programs being completed were legitimate in any objective respect.

61.    As described below, although NOVARTIS' senior management was aware of the fraud being effectively perpetrated by Mr. Schaeffer, no corrective action was ever taken against Mr. Schaeffer and, instead, he was recognized by NPC as exemplifying the "approach" to sales that the Company desired to promote.

62.    NOVARTIS' use of Patient Programs and other speaker programs to pay physicians for writing Gilenya prescriptions worked. In 2012, the Philadelphia MS Area Sales Team achieved the greatest sales performance for the year and moved its ranking from 17 out of 17 in 2011 to eight out of 17 in 2012.

63.    NOVARTIS has approximately 70 Gilenya prescribing health care providers in the Philadelphia North and South territories combined. The territories utilize the same five approved patient speakers, four of which could prescribe medication, to conduct the Patient Events. It is no coincidence that the four prescribing speakers paid to conduct Patient Events

17

account for forty-three percent (43%) of Gilenya prescriptions written in 2012 for these territories.   While these same four speakers only account for six percent (6%) of the total prescribing health care providers in the region, they accounted for almost half of the prescriptions written for Gilenya in the Philadelphia territories.

64.    In recognition of the fact that the speaker programs and related payments to physicians actually were simply utilized as kickbacks to reward physicians for writing Gilenya prescriptions, Plaintiff-Relator was discouraged from using the services of an approved speaker who did not have prescription writing privileges (*i.e.*, a nurse) – even though this speaker was a person who attempted to attract new patients to attend events and legitimately sought to educate prospective users of Gilenya.   Plaintiff-Relator continued to use the services of this speaker because the events at which she spoke tended to be more legitimate (given her willingness to personally seek out new patient attendees) but, nevertheless, this speaker only was scheduled for ten Patient Events in 2012 (significantly fewer than the average of approximately 17.5 Patient Events for the other approved speakers).

65.    In the March or April 2012, Plaintiff-Relator, as well as the Philadelphia area sales specialist, Wayne Lauer, Nurse Educator, Sierra McMonagle and other colleagues of Plaintiff-Relator, notified Mr. Schaeffer that the patient programs were experiencing poor attendance and the same people (certain patients and other random people, including children and entire families, who obviously were not prospective users of Gilenya) were attending the Patient Events over and over again.

66.    At the same time, Mr. Schaeffer was also informed that entire families were attending these events and, based upon Plaintiff-Relator's observations, they were not concerned

18

about MS, and attended simply for the free meal.  For example, at one Patient Event in Plymouth Meeting, Pennsylvania, a family of eight attended and showed zero interest during the presentation, leaving after the dinner was complete and before the event was ended.

67.     Despite the communication of concerns from his staff, Mr. Schaeffer continued to pressure his sales force to complete Patient Events.  Indeed, there were literally no budgets established with respect to these speaker programs during 2012 or budgetary constraints with respect to the number of Patient Events that could be conducted at NPC.

68.     In May or June 2012, one of Plaintiff-Relator's colleagues received a conduct memorandum and was advised that she was not meeting expectations in the total number of Patient Events she was completing, notwithstanding the fact that she was ranked near the top in the nation.

69.     By the Summer of 2012, the Patient Events were attracting between zero to six attendees on average.  Once in a while, there would be ten or more attendees, but this was a rarity.  In addition, eighty percent (80%) or more of the attendees were repeat attendees, with many attending the same presentation with the same speaker within the prior three weeks.  In fact, some attendees saw the same speaker and the same presentation twice within the same week.

70.     Even more alarming than the lack of attention and participation by the attendees was NOVARTIS' treatment of cancellations.  It was widely recognized throughout NOVARTIS by sales specialists and nurse educators that, if an event needed to be cancelled, one should wait until 48 hours prior to the event and the speaker then would still be paid.  Although Mr. Schaeffer and the NOVARTIS management knew on occasion that invitations to events were not

19

even sent, newspaper advertisements were not placed on all occasions when they were supposed to be and RSVP counts were low or non-existent, NOVARTIS' sales force was nonetheless encouraged not to cancel before the 48-hour time-frame. This conduct is simply additional indicia of NOVARTIS' objective with respect to these Patient Events -- to keep its high-volume Gilenya prescribers happy by lining their pockets with speaker fees.

71.     On August 2, 2012, a team meeting was held at The Marriott in Conshohocken, Pennsylvania. The meeting consisted of two Philadelphia Sales Specialists, one or two Wilkes Barre Sales Specialists, one or two Harrisburg Sales Specialists, two Nurse Educators, an Account Manager, an Area Business Leader and Randi Roberts, NPC's Vice President and Head of Sales. A portion of this meeting was dedicated to a discussion on Patient Events. The group explained how attendance was poor, the attendees had seen the same presentation over and over again, issues had arisen with newspaper advertisements for events not being placed and invitations not being sent out. Vice President and Head of Sales, Randi Roberts, listened, congratulated the group for doing the most events, but to Plaintiff-Relator's surprise, never expressed any surprise or outrage regarding the concerns being expressed regarding the Patient Events, recommended any changes to the territories' egregious Patient Events or took any action to put a stop to this patently fraudulent and unethical conduct.

72.     In addition, Mr. Schaeffer was repeatedly advised throughout 2012 that the Patient Events were not working or helping patients. However, Mr. Schaeffer refused to listen to his sales force and simply indicated that the team should maintain 16 patient events per trimester per territory.

**C.     Mr. Schaeffer's History With and Use of Patient Events**

20

73.     Mr. Schaeffer began with NOVARTIS in August 2010, as the Washington D.C. Area Business Leader.  In 2011, according to the sales specialists in that area, Mark Farris and Lisa Thomas, they were required to do the most Patient Events and Peer-to-Peer programs in the nation during that year (2011).

74.     In 2012, Mr. Schaeffer was recognized nationally by NOVARTIS for the amount of patient events Philadelphia achieved.  In fact, he was promoted to an in-house position at the end of 2012 and received a Gilenya "Giant" award, one of only four people in NPC's MS group that year to receive such an award.

75.     Throughout 2012, there were numerous conversations with Mr. Schaeffer regarding the lack of value of Patient Events in the manner and quantity that were being completed.  Mr. Schaeffer conceded that the patient events were not valuable but stated to Plaintiff-Relator that the true value was "***taking care of the speaker***."

76.     In the fourth quarter of 2012, NPC slowed the number of Patient Events in the Philadelphia territories and, upon information and belief, throughout the United States, in response to scrutiny by the United States government regarding its sales practices with respect to other drugs and what appear to be explicit violations of the previous CIA.  Nevertheless, NPC still conducted nine Patient Events in the Philadelphia territories in the first trimester of 2013 – a number which dwarfs those of competitors in the same area.

77.     As of October 1, 2012, Mr. Schaeffer's combined territories in Pennsylvania (*i.e.*, Philadelphia, Wilkes Barre and Harrisburg) were first in the nation with 162 Patient Events as of that date, with Los Angeles (153 Patient Events) and Chicago (139 Patient Events), respectively, in second and third places for 2012 as of that date.  The pervasive nature of these excessive

21

Patient Events from coast-to-coast in the United States demonstrates NOVARTIS' corporate decision to use excessive numbers of Patient Events to compensate physicians who wrote Gilenya scripts.

78.     In recognition of the fact that paying physicians to prescribe Gilenya was the entire purpose of the Patient Events and part of NOVARTIS' explicit marketing and sales "philosophy," in 2013, there have been weekly conference calls concerning Dr. Jason Silversteen – a young, high-volume Gilenya writing physician based in the State of Delaware – who NPC personnel refer to internally as a "Whale," based on the amount of Gilenya prescriptions he writes. James (Jim) Pizano, Account Manager, leads these calls. Mr. Pizano has explicitly stated that he is extremely concerned that, since the Patient Events have decreased in 2013, NOVARTIS needs to find additional ways to "show him love and keep him happy." As such, Mr. Pizano is constantly searching for ways to have Dr. Silversteen speak outside the Philadelphia area, as well as other ways, to put money in his pocket.

79.     As further evidence of the corrupt marketing and sales philosophy pursued by NOVARTIS, if a speaker was not writing enough Gilenya prescriptions (*i.e.*, scripts), NOVARTIS management quickly ensured that the speakers understood the true nature of the Patient Events. To this end, NPC tracked the prescriptions written by all physicians, including speakers, and evaluated the number of speaking engagements they should be given on the basis of the number of prescriptions of Gilenya written.

80.     As noted above, NOVARTIS had five patient speakers who were utilized in 2012 in its Philadelphia territories. One of the speakers, Dorothea Pfohl, is a registered nurse and could not prescribe medications. As a consequence, Mr. Schaeffer had little to no interest in

22

using her as a speaker because of his belief that there would be a minimum return on investment.

Plaintiff-Relator tried to convince Mr. Schaffer that Ms. Pfohl should be utilized because she

would routinely invite patients on her own and these would be new patients that did not

previously hear the presentation – which quickly had become a rarity in the territories.

Nevertheless, Mr. Schaeffer discouraged and resisted the use of Ms. Pfohl as a speaker even

though she was approved, competent and more industrious in attracting new patients, when as

compared to other speakers. The reason for that resistance was plain: Since Ms. Pfohl could not

directly prescribe Gilenya, there was no good reason in Mr. Schaeffer's mind to use her as a

speaker, since speaker compensation, as opposed to patient education, was the purpose and goal

of the Patient Events.

     81.    Toward the end of 2012, new prescriptions were slowing for two of the

Philadelphia area speakers, Dr. Lee Harris and Dr. David Tabby. Mr. Schaeffer mentioned, on

numerous occasions, that the sales force needed to ask the doctors "to return the favor and

submit more prescriptions" -- the favor being supplying the doctors with additional income

through Patient Events. Indeed, Mr. Schaeffer would become verbally irate because doctors

were not writing more prescriptions. In venting to Plaintiff-Relator, Mr. Schaeffer stated that Dr.

Harris was paid over $40,000 in speaking fees in 2012, insinuating that he should be writing

more Gilenya scripts in return for these significant payments.

     82.    In addition to Patient Events, NOVARTIS also used and continues to use Peer-to-

Peer events as another means and as part of its scheme to provide remuneration to health care

providers to increase Gilenya's sales and market share by paying physicians in return for writing

Gilenya scripts.

23

### D.   Improper Peer-to-Peer Events

83.   Pursuant to NOVARTIS "official" guidelines, Peer-to-Peer events were to have at least three attendees to qualify for payment. NPC circumvented this requirement by scheduling Peer-to-Peer events with verbal reservations, which often led to the cancellation of the event (but with payment still being made to the speaker) or attendance of less than the required number of attendees (which still resulted in payment being made to the speaker). So long as there were at least three attendees "on the books," the event "occurred" and the speaker was paid.

84.   On August 22, 2012, Dr. Kaufman, an out-of-town speaker, spoke at a dinner event at CHOPS restaurant in Philadelphia. Mr. Pizano, the Account Manager, was the lead for this event. In order to persuade Dr. Kaufman to come to Philadelphia, he requested and was given three speaking events for his trip. It is common knowledge that many speakers will not travel unless they are given multiple speaking engagements, and NOVARTIS goes out of its way to ensure multiple speaker events per trip. Thus, Dr. Kaufman was scheduled for three speaking events during his trip. The attendees at the dinner on August 22, 2012 were doctors, nurses, medical students and medical assistants. Novartis attendees included: Jim Pizano, Mr. Schaeffer, Michele Covington, Dr. Kaufman, Wayne Lauer and Plaintiff-Relator, who observed the final bill being over the $125 per person limit established under NPC's "official" policies.

85.   On August 23, 2012, in connection with speaking at breakfast and lunch programs, Dr. Kaufman commented to Wayne Lauer that Jim Pizano seemed rattled by the bill from the evening before. According to Wayne Lauer, in order to rectify the situation, Jim Pizano simply added at least two names to the attendance sign in sheet (even though these individuals were not in attendance at the dinner) to reduce the price per person and thus eliminate the issue.

24

### E.   NOVARTIS Conducted Return On Investment Analysis

86.   Once a physician was in the Company's speaker system, it was up to Plaintiff-Relator and his colleagues to ensure that the physician was "on message," meaning that he had plenty of "experience" with Gilenya, a favorable outlook on Gilenya, and the ability to stand up, speak and convince other physicians to prescribe the product. NOVARTIS speakers were often paid to speak repeatedly to the same offices or even to other physicians within their own practice. Defendant often engaged in conversations with the sales force when physicians were paid as consultants yet were not meeting minimum prescription levels. For example, if a speaker's prescriptions of Gilenya began to decrease, NPC's management would want to know why and would often discuss whether using a different speaker or reducing a speaker's commitments was necessary under the circumstances.

87.   While pharmaceutical companies need insight from physicians to improve drug treatments, the communications should be based upon legitimate need, and the consultants should be "bona fide." The consultant payments alleged herein, however, were based on the volume of prescriptions that physicians would potentially write and, in fact, did write.

## VII.   OTHER VIOLATIONS

### A.   Pricing Violations

88.   Pharmaceutical manufacturers participating in Medicaid programs must rebate to the States, a certain statutorily-prescribed portion of the price of drugs purchased by each Medicaid program in each state. 42 U.S.C. §1396r-8(a)(1). Manufacturers do this because the Medicaid statute, 42 U.S.C. §§1396a-u, permits the federal Government to partially reimburse States only for drugs purchased from manufacturers who have agreed to pay statutorily specified

rebates to those States. 42 U.S.C. §1396r-8. Thus, pharmaceutical manufacturers that want their drugs available to Medicaid beneficiaries under the Medicaid program enter into a Rebate Agreement with HHS to provide such rebates. 42 U.S.C. §1396r-8(a)(1).

89. The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form CMS-367). The Quarterly Report includes information regarding each of the manufacturers' "Covered" Drugs, including such information as its "Average Manufacturer Price" ("AMP"), "Baseline AMP," and its "Best Price." Based upon this information, HHS, through its component agency, The Centers for Medicare & Medicaid Services ("CMS"), then informs the States of the rebate which they are entitled to collect with respect to each drug.

90. Defendant entered into a Rebate Agreement with HHS. In that Agreement, Defendant agreed to comply with 42 U.S.C. §1396r-8, and therefore:

a. Agreed to report its Best Price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, etc.

b. Agreed that it would determine its Best Price based upon its AMP, calculated as "net sales divided by numbers of units sold, excluding free goods (*i.e.*, drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include in the calculation, cash discounts and all other price reductions "which reduce the actual price paid"; and

c. Agreed that the Best Price would not take into account nominal prices, defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

26

91.     After execution of this Agreement, Defendant reported its AMP and/or Best Price in each quarter, to the Medicaid Program on an electronic form of Form CMS-367.

92.     As alleged herein, Defendant failed to take into account the kickbacks it paid when reporting its Best Price.

93.     As a result, Defendant's Best Price, for quarterly reports submitted for at least the past three years, were inflated, which reduced the percentage difference between AMP and Best Price, thereby reducing the rebate amount that Defendant ultimately paid to each State Medicaid program.  Defendant artificially inflated its Best Price, by calculating its Best Price without taking into account its inducement activities alleged in this Complaint, which reduced the true cost of its drugs.  Defendant knowingly set and reported its Best Price for these drugs at levels far higher than the actual Best Price, in Form CMS-367, submitted quarterly to CMS for at least the past six years.  By doing so, Defendant has violated the FCA (and applicable state False Claims Acts), by knowingly making, using, or causing to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money to federal and state governments.

94.     Under the Veterans Health Care Act of 1992 ("VHCA"), drug manufacturers are required to enter a pricing agreement with HHS for the section 340B Drug Pricing Program, and with the Department of Veterans Affairs (the "VA") and other Department of Defense programs.

95.     Once a labeler/manufacturer enters into such a pricing agreement, its drugs are listed on the Federal Supply Schedule ("FSS"), a price list containing over 20,000 pharmaceutical products.  The VA and other Government Healthcare Programs depend on the

FSS for most of their drug purchases, with the exception of several national contracts awarded for specific drugs considered to be therapeutically interchangeable.

96.     Under the VHCA, drug manufacturers must comply with 38 U.S.C. § 8126. Subsection (a)(2) requires that "the price charged during the one-year period beginning on the date on which the agreement takes effect may not exceed 76 percent of the non-Federal average manufacturer price (less the amount of any additional discount required under subsection (c)) ...."

97.     As alleged herein, Defendant failed to take into account its inducements when reporting the non-Federal average manufacturer price. Defendant therefore violated 38 U.S.C. § 8126, causing damage to the VA program and, by not giving its best price as set forth in subsection (a)(2), Defendant became ineligible for Medicare and other federal program reimbursement.

## VIII.   CONCLUSION

98.     The decision-making of the physician, that important element in Government Healthcare Program coverage policy, was completely undermined by the unlawful marketing of NOVARTIS. The physicians prescribing Gilenya did not necessarily do so because they believed, based on their review of peer-reviewed medical literature, or discussions with their colleagues, that the drug would help their patients; rather, Gilenya was often prescribed because the physicians were actively pursued and enticed by NOVARTIS with kickbacks. At all pertinent times, NPC engaged in this unlawful conduct throughout the United States of America and in all of the jurisdictions for which Plaintiff-Relator seeks lawful relief and damages.

### COUNT I – FCA

28

99.     Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

100.    This is a claim by Plaintiff-Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendant, for knowingly causing to be presented false claims to Government Healthcare Programs. From on or about September 2010 through the present, in the Southern District of New York and elsewhere throughout the United States, Defendant has knowingly and willfully violated the FCA by submitting and causing false claims to be submitted.

101.    Defendant has knowingly caused pharmacies and other health care providers to submit Pharmacy, CMS-1500, and other claim forms for payment, knowing that such false claims would be submitted to state Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing for prescriptions induced by kickbacks and/or for non-covered uses and therefore false claims. By virtue of the acts alleged herein, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. §3729(a)(1)(A) and 31 U.S.C. §3729(a)(1)(B).

102.    Defendant has violated 31 U.S.C. § 3729(a)(1)(B) by causing the States to submit false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement was sought, including Gilenya, were paid for in compliance with federal law including the AKA, yet the States sought reimbursement from the United States Government for all Gilenya expenditures.

103.    Defendant caused false claims to be submitted, resulting in Government

Healthcare Program reimbursement to healthcare providers in the millions of dollars, in violation

of the FCA, 31 U.S.C. § 3729, *et seq.* and the AKA, 42 U.S.C. § 1320a-7b(b)(2)(A).

104.    The United States is entitled to three times the amount by which it was damaged,

to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than

$11,000.00 for each false claim presented or caused to be presented.

WHEREFORE, Plaintiff-Relator respectfully requests this Court enter judgment against

Defendant as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the FCA;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Plaintiff-Relator necessarily incurred in bringing and pressing this case;

(d)    That the Plaintiff-Relator be awarded the maximum amount allowed pursuant to the FCA; and

(e)    That the Court award such other and further relief as it deems proper.

## COUNT II – CALIFORNIA FALSE CLAIMS ACT

105.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

106.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

California to recover treble damages and civil penalties under the California False Claims Act,

Cal. Gov't. Code § 12650, *et seq.*

107.    Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

(4) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

108.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

109.    Defendant violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2  by engaging in the conduct alleged herein.

110.    Defendant furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, Cal. Bus. & Prof. Code § 650-650.1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

111.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

112.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendant's conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

113.    Had the State of California known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

114.    As a result of Defendant's violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

115.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

116.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

(1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;

32

(2)     A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT III – COLORADO MEDICAID FALSE CLAIMS ACT

117.     Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

118.     This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304, *et seq.*

119.     Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304, provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
> (c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;
> (d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado

Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ... or

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

120.    In addition, C.R.S.A. § 25.5-4-414 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part, under the Colorado Medicaid program.

121.    Defendant violated the Colorado Medicaid False Claims Act by engaging in the conduct alleged herein.

122.    Defendant further violated the Colorado Medicaid False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and C.R.S.A. § 25.5-4-414, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

123.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

124.    Compliance with applicable Medicare, Medicaid and the various other federal and
state laws cited herein was an implied, and upon information and belief, also an express
condition of payment of claims submitted to the State of Colorado in connection with
Defendant's conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy
Manuals was also an express condition of payment of claims submitted to the State of Colorado.

125.    Had the State of Colorado known that Defendant was violating the federal and
state laws cited herein and/or that the claims submitted in connection with Defendant conduct
failed to meet the reimbursement criteria of the Government-funded healthcare programs or were
premised on false and/or misleading information, it would not have paid the claims submitted by
healthcare providers and third-party payers in connection with that conduct.

126.    As a result of Defendant's violations of the Colorado Medicaid False Claims Act,
the State of Colorado has been damaged in an amount far in excess of millions of dollars,
exclusive of interest.

127.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the
allegations of this Complaint, who has brought this action pursuant to the Colorado Medicaid
False Claims Act on behalf of himself and the State of Colorado.

128.    This Court is requested to accept supplemental jurisdiction of this related state
claim as it is predicated upon the exact same facts as the federal claim, and merely asserts
separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following
damages to the following parties and against Defendant:

To the STATE OF COLORADO:

(1)    Three times the amount of actual damages which the State of Colorado has
sustained as a result of Defendant's conduct;

35

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Colorado;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT IV – CONNECTICUT FALSE CLAIMS ACT

129.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

130.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq*.

131.    Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;
(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

36

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;
(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and intending to defraud the state or willfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;
(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;
(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or
(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

132.   In addition, Conn. Gen. Stat. § 53a-161c prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part under the Connecticut Medicaid program.

133.   Defendant violated the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq.* by engaging in the conduct alleged herein.

134.   Defendant further violated the Connecticut False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, and Conn. Gen. Stat. § 53a-161c, and by virtue of the fact that none of the

37

claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

135.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

136.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendant's conduct. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Connecticut.

137.    Had the State of Connecticut known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

138.    As a result of Defendant's violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

139.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Connecticut False Claims Act on behalf of himself and the State of Connecticut.

140.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF CONNECTICUT:

(1)    Three times the amount of actual damages which the State of Connecticut
has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each
false claim which Defendant caused to be presented to the State of
Connecticut;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Connecticut False Claims Act,
Conn. Gen. Stat. § 17b-301a *et seq*. and/or any other applicable provision
of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred
in connection with this action;

(2)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT V – DELAWARE FALSE CLAIMS AND REPORTING ACT

141.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

142.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Delaware to recover treble damages and civil penalties under the Delaware False Claims and

Reporting Act, Title 6, Chapter 12 of the Delaware Code.

143.    6 Del. C. § 1201(a) provides liability for any person who:

> (1) knowingly presents, or causes to be presented, directly or indirectly, to
> an officer or employee of the Government a false or fraudulent claim for
> payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, directly or
> indirectly, a false record or statement to get a false or fraudulent claim
> paid or approved; or
> (3) conspires to defraud the Government by getting a false or fraudulent
> claim allowed or paid.

144.    In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any

remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly,

in cash or in kind in return for the furnishing of any medical care or services for which payment

may be made in whole or in part under any public assistance program.

145.    Defendant violated 31 Del. C. § 1005 by engaging in the conduct alleged herein.

146.    Defendant further violated 6 Del. C. § 1201(a) and knowingly caused hundreds of

thousands of false claims to be made, used and presented to the State of Delaware by its

deliberate and systematic violation of federal and state laws, including the FDCA, the AKA, and

31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted in connection with

its conduct were even eligible for reimbursement by the Government-funded healthcare

programs.

147.    The State of Delaware, by and through the Delaware Medicaid program and other

state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by

healthcare providers and third-party payers in connection therewith.

148.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendant's conduct.  Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

149.    Had the State of Delaware known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

150.    As a result of Defendant's violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

151.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

152.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

(1)     Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

41

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VI – FLORIDA FALSE CLAIMS ACT

153.   Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

154.   This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

155.   Fla. Stat. § 68.082(2) provides liability for any person who:

> (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;
>
> (b)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency; or
>
> (c)  conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

156.   In addition, Fla. Stat. § 409.920 makes it a crime to:

> (c) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;
>
> * * *
>
> (e) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or

service, for which payment may be made, in whole or in part, under the
Medicaid program.

157.    Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt
of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash
or in kind, in exchange for referring or soliciting patients.

158.    Defendant violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in
the conduct alleged herein.

159.    Defendant further violated Fla. Stat. § 68.082(2) and knowingly caused hundreds
of thousands of false claims to be made, used and presented to the State of Florida by its
deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA,
Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none of the claims
submitted in connection with its conduct were even eligible for reimbursement by the
Government-funded healthcare programs.

160.    The State of Florida, by and through the Florida Medicaid program and other state
healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by
healthcare providers and third-party payers in connection therewith.

161.    Compliance with applicable Medicare, Medicaid and the various other federal and
state laws cited herein was an implied, and upon information and belief, also an express
condition of payment of claims submitted to the State of Florida in connection with Defendant's
conduct.  Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was
also an express condition of payment of claims submitted to the State of Florida.

162.    Had the State of Florida known that Defendant was violating the federal and state
laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed
to meet the reimbursement criteria of the Government-funded healthcare programs or were

44

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

163.    As a result of Defendant's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

164.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

165.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF FLORIDA:

(1)    Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Florida;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

45

(4)    Such further relief as this Court deems equitable and just.

## COUNT VII – GEORGIA FALSE MEDICAID CLAIMS ACT

166.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

167.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims

Act, Ga. Code Ann., § 49-4-168, *et seq.*

168.    The Georgia False Medicaid Claims Act imposes liability on any person who:

> (1) Knowingly presents or causes to be presented to the Georgia
> Medicaid program a false or fraudulent claim for payment or
> approval;
> (2) Knowingly makes, uses, or causes to be made or used a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Georgia Medicaid program;
> (3) Conspires to defraud the Georgia Medicaid program by getting
> a false or fraudulent claim allowed or paid;
> (4) Has possession, custody, or control of property or money used
> or to be used by the Georgia Medicaid program and, intending to
> defraud the Georgia Medicaid program or willfully to conceal the
> property, delivers, or causes to be delivered, less property than the
> amount for which the person receives a certificate of receipt;
> (5) Being authorized to make or deliver a document certifying
> receipt of property used, or to be used, by the Georgia Medicaid
> program and, intending to defraud the Georgia Medicaid program,
> makes or delivers the receipt without completely knowing that the
> information on the receipt is true;
> (6) Knowingly buys, or receives as a pledge of an obligation or
> debt, public property from an officer or employee of the Georgia
> Medicaid program who lawfully may not sell or pledge the
> property; or
> (7) Knowingly makes, uses, or causes to be made or used a false
> record or statement to conceal, avoid, or decrease an obligation to
> pay, repay, or transmit money or property to the State of Georgia.

169.    Defendant violated the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-

4-168, *et seq.* by engaging in the conduct alleged herein.

46

170.    Defendant further violated the Georgia False Medicaid Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws, including the FDCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

171.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

172.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendant's conduct.  Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

173.    Had the State of Georgia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

174.    As a result of Defendant's violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

175.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to the Georgia False

Medicaid Claims Act on behalf of himself and the State of Georgia.

176.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF GEORGIA:

(1)     Three times the amount of actual damages which the State of Georgia has
        sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $11,000 for each
        false claim which Defendant caused to be presented to the State of
        Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Georgia False Medicaid
        Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable
        provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred
        in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VIII – HAWAII FALSE CLAIMS ACT

177.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

178.     This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw.

Rev. Stat. § 661-21, *et seq.*

179.     Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the state a false or fraudulent claim for payment or
> approval;
> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or d by
> the state;
> (3) conspires to defraud the state by getting a false or fraudulent
> claim allowed or paid; or
>
> * * *
>
> (8) is a beneficiary of an inadvertent submission of a false claim to
> the State, who subsequently discovers the falsity of the claim, and
> fails to disclose the false claim to the State within a reasonable
> time after discovery of the false claim.

180.     Defendant violated Haw. Rev. Stat. §661-21(a) and knowingly caused hundreds

of thousands of false claims to be made, used and presented to the State of Hawaii by its

deliberate and systematic violation of federal and state laws, including the FDCA and AKA, and

by virtue of the fact that none of the claims submitted in connection with its conduct were even

eligible for reimbursement by the Government-funded healthcare programs.

181.     The State of Hawaii, by and through the Hawaii Medicaid program and other state

healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by

healthcare providers and third-party payers in connection therewith.

182.     Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Hawaii in connection with Defendant's

conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

183.   Had the State of Hawaii known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

184.   As a result of Defendant's violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

185.   Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

186.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF HAWAII:

(1)   Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's illegal conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Hawaii;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Plaintiff-Relator:

    (1)    The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IX – ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT

187.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

188.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175, *et seq.*

189.    740 ILCS 175/3(a) provides liability for any person who:

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; or

    (3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

190.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

191.   Defendant violated 305 ILCS 5/8A-3(b) by engaging in the conduct alleged herein.

192.   Defendant furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

193.   The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

194.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

195.   Had the State of Illinois known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

196.   As a result of Defendant's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

197.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

198.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT X –INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

199.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

200.     This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Indiana to recover treble damages and civil penalties under the Indiana False Claims and

Whistleblower Protection Act, Indiana Code 5-11-5.5, *et seq.*, which imposes liability on:

> (b) A person who knowingly or intentionally:
>
> (1) presents a false claim to the state for payment or approval;
> (2) makes or uses a false record or statement to obtain payment or
> approval of a false claim from the state;
> (3) with intent to defraud the state, delivers less money or property
> to the state than the amount recorded on the certificate or receipt
> the person receives from the state;
> (4) with intent to defraud the state, authorizes issuance of a receipt
> without knowing that the information on the receipt is true;
> (5) receives public property as a pledge of an obligation on a debt
> from an employee who is not lawfully authorized to sell or pledge
> the property;
> (6) makes or uses a false record or statement to avoid an obligation
> to pay or transmit property to the state;
> (7) conspires with another person to perform an act described in
> subdivisions (1) through (6); or
> (8) causes or induces another person to perform an act described in
> subdivisions (1) through (6) ....

201.     In addition, Indiana Code § 5-11-5.5, *et seq.* prohibits the solicitation or receipt

of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind in return for furnishing any item or service for which payment may

be made, in whole or in part, under the Indiana Medicaid program.

202.     Defendant violated Indiana's False Claims Act by engaging in the conduct

alleged herein.

203.     Defendant further violated Indiana's False Claims Act and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State of Indiana by

its deliberate and systematic violation of federal and state laws, including the FDCA and federal

AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct

were even eligible for reimbursement by the Government-funded healthcare programs.

204.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

205.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendant's conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

206.    Had the State of Indiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

207.    As a result of Defendant's violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

208.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Indiana Code § 5-11-5.5 *et seq.*, on behalf of himself and the State of Indiana.

209.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF INDIANA:

    (1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Indiana;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

    (1)    The maximum amount allowed pursuant to Indiana Code § 5-11-5.5, *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XI - IOWA FALSE CLAIMS LAW

210.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

211.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1, *et seq*.

212.    Iowa False Claims Law, I.C.A. § 685.2, in pertinent part, provides for liability for any person who:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c) Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

213.    Defendant violated the Iowa False Claims Law, I.C.A. § 685.1, *et seq.* by engaging in the conduct described herein.

214.    Defendant furthermore violated the Iowa False Claims Law, I.C.A. § 685.1, *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

215.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

216.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendant's conduct. Compliance with applicable Iowa statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Iowa.

217.    Had the State of Iowa known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by

57

healthcare providers and third-party payers in connection with that conduct.

218.   As a result of Defendant's violations of the Iowa False Claims Law, I.C.A. § 685.1, *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

219.   Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1, *et seq.*, on behalf of himself and the State of Iowa.

220.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF IOWA:

(1)   Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Iowa; or

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)   The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1, *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

58

(4)     Such further relief as this Court deems equitable and just.

## COUNT XII – LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

221.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

222.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1, *et seq.*

223.    La. Rev. Stat. Ann. § 438.3 provides:

> (A)  No person shall knowingly present or cause to be presented a false or fraudulent claim;
>
> (B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
>
> (C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

224.    In addition, La. Rev. Stat. Ann. § 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes and/or rebates, directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for, in whole or in part, by the Louisiana medical assistance programs.

225.    Defendant violated La. Rev. Stat. Ann. § 438.2(A) by engaging in the conduct alleged herein.

226.    Defendant further violated La. Rev. Stat. Ann. §438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal

59

AKA and La. Rev. Stat. Ann. § 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

227.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

228.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

229.    Had the State of Louisiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

230.    As a result of Defendant's violations of La. Rev. Stat. Ann. § 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

231.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of himself and the State of Louisiana.

232.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1)    Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIII – MARYLAND FALSE CLAIMS ACT

233.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

234.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, MD Code, Health - General, § 2-601, *et seq.*

61

235.    Section 2-602 of Maryland's False Claims Act imposes liability as

follows:

    (a)    A person may not:

        (1)    Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

        (2)    Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

        (3)    Conspire to commit a violation under this subtitle;

        (4)    Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

        (5)    (i) Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii) Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

        (6)    Knowingly buy or receive as a pledge of an obligation or debt publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

        (7)    Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

        (8)    Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

        (9)    Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

236.    In addition, MD Code, Criminal Law, § 8-512, prohibits the solicitation or receipt

of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Maryland Medicaid program.

237.    Defendant violated the Maryland False Claims Act by engaging in the conduct alleged herein.

238.    Defendant further violated the Maryland False Claims Act, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and Section 8-512 of Maryland's Criminal Law, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

239.    The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

240.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendant's conduct.  Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

241.    Had the State of Maryland known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

63

242. As a result of Defendant's violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

243. Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of himself and the State of Maryland.

244. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MARYLAND:

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's conduct;

(2) A civil penalty of not more than $10,000 for each false claim which Defendant caused to be presented to the State of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Plaintiff-Relator:

(1) The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIV – MASSACHUSETTS FALSE CLAIMS ACT

245.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

246.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5A, *et seq.*

247.    Mass. Gen. Laws Ann. Chap. 12 § 5B, provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth;

> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim; or

> \* \* \*

> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

248.    In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any good, service or item for which payment may be made, in whole or in part, under the Massachusetts Medicaid program.

249.    Defendant violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging in the conduct alleged herein.

250.    Defendant further violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, Mass. Gen. Law Ann. Chap. 118E § 41, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

251.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

252.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct.  Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

253.    Had the Commonwealth of Massachusetts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

254.     As a result of Defendant's violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the
Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of
dollars, exclusive of interest.

255.     Plaintiff-Relator is a private citizen with direct and independent knowledge of the
allegations in this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann.
Chap. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

256.     This Court is requested to accept supplemental jurisdiction of this related state
claim as it is predicated upon the exact same facts as the federal claim, and merely asserts
separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid
program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following
damages to the following parties and against Defendant:

To the Commonwealth OF MASSACHUSETTS:

(1)     Three times the amount of actual damages which the Commonwealth of
Massachusetts has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each
false claim which Defendant caused to be presented to the Commonwealth
of Massachusetts;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap.
12, §5F and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred
in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

67

(4)     Such further relief as this Court deems equitable and just.

## COUNT XV – MICHIGAN MEDICAID FALSE CLAIMS ACT

257.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

258.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Michigan to recover treble damages and civil penalties under Michigan's Medicaid False Claims

Act, Mich. Comp. Laws Ann. § 400.603, *et seq.*, which provides in pertinent part as follows:

> Sec. 3. (1) A person shall not knowingly make or cause to be made
> a false statement or false representation of a material fact in an
> application for medicaid benefits; and
>
> (2) A person shall not knowingly make or cause to be made a false
> statement or false representation of a material fact for use in
> determining rights to a medicaid benefit ....

259.    In addition, Mich. Comp. Laws Ann. § 400.604 prohibits the solicitation or

receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly,

overtly or covertly, in cash or in kind, in return for furnishing any item or service for which

payment may be made, in whole or in part, under the Michigan Medicaid program.

260.    Defendant violated the Medicaid False Claims Act by engaging in the conduct

alleged herein.

261.    Defendant further violated Michigan law and knowingly caused hundreds of

thousands of false claims to be made, used and presented to the State of Michigan by its

deliberate and systematic violation of federal and state laws, including the FDCA and federal

AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct

were even eligible for reimbursement by the Government-funded healthcare programs.

68

262.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

263.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendant's conduct.  Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

264.    Had the State of Michigan known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

265.    As a result of Defendant's violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

266.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Medicaid False Claims Act on behalf of himself and the State of Michigan.

267.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF MICHIGAN:

    (1)    Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Michigan;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

    (1)    The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### COUNT XVI – MINNESOTA FALSE CLAIMS ACT

268.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

269.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01, *et seq.*

270.    Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

    (1) knowingly presents, or causes to be presented, to an officer or employee of

70

the state or a political subdivision a false or fraudulent claim for payment or approval;

(2)  knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision; knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

(3) has possession, custody, or control of public property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered to the state or a political subdivision less money or property than the amount for which the person receives a receipt;

(4) is authorized to prepare or deliver a receipt for money or property used, or to be used, by the state or a political subdivision and knowingly prepares or delivers a receipt that falsely represents the money or property;

(5) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(6) knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

271.    In addition, M.S.A. § 256B.0914, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Minnesota Medicaid program.

272.    Defendant violated the Minnesota False Claims Act by engaging in the conduct alleged herein.

273.    Defendant further violated the Minnesota False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and M.S.A. § 256B.0914, and by virtue of the fact that none of the claims submitted in

connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

274.    The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

275.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendant's conduct. Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Minnesota.

276.    Had the State of Minnesota known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

277.    As a result of Defendant's violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

278.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Minnesota False Claims Act, on behalf of himself and the State of Minnesota.

279.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MINNESOTA:

(1)     Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Minnesota;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVII – MONTANA FALSE CLAIMS ACT

280.     Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

281.     This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401, *et seq.*

282.     Montana's False Claims Act, MCA § 17-8-403, provides for liability for any

73

person who:

> (a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;
>
> (c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;
>
> (d) has possession, custody, or control of public property or money used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, delivers or causes to be delivered less property or money than the amount for which the person receives a certificate or receipt;
>
> (e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without knowing that the information on the receipt is true;
>
> (f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;
>
> (g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors; or
>
> (h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

283.    In addition, MCA § 45-6-313 prohibits the solicitation or receipt of any

remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Montana Medicaid program.

284.    Defendant violated the Montana False Claims Act by engaging in the conduct alleged herein.

285.    Defendant furthermore violated the Montana False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and MCA § 45-6-313, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

286.    The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

287.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendant's conduct.  Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

288.    Had the State of Montana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

289.    As a result of Defendant's violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

290.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Montana False Claims Act on behalf of himself and the State of Montana.

291.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MONTANA:

(1)    Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVIII – NEVADA FALSE CLAIMS ACT

292.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

293.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et. seq.*

294.    N.R.S. § 357.040(1) provides liability for any person who –

      (a) knowingly presents or causes to be presented a false claim for payment or approval;

      (b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

      (c) conspires to defraud by obtaining allowance or payment of a false claim; and/or

                        \*\*\*

      (h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

295.    In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made, in whole or in part, under the Nevada Medicaid program.

296.    Defendant violated N.R.S. § 422.560 by engaging in the conduct alleged herein.

297.    Defendant further violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and N.R.S. § 422.560, and by virtue of the fact that none of the claims submitted in connection

77

with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

298.    The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

299.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendant's conduct.  Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

300.    Had the State of Nevada known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

301.    As a result of Defendant's violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

302.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

303.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the STATE OF NEVADA:

(1)    Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Nevada;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIX – THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS LAW

304.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

305.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b, which provides that:

Any person shall be liable who...

(a)    knowingly presents, or causes to be presented, to an officer or employee of the State, a false or fraudulent claim for payment or approval;

(b)      knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; and/or

(c)      conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

306.      In addition, New Hampshire prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program.

307.      Defendant violated New Hampshire law by engaging in the conduct alleged herein.

308.      Defendant furthermore violated N.H. Rev. Stat. Ann. §167:61-b, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

309.      The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

310.      Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with Defendant's conduct.  Compliance with applicable New Hampshire statutes, regulations and

Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

311.    Had the State of New Hampshire known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

312.    As a result of Defendant's violations of N.H. Rev. Stat. Ann. §167:61-b, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

313.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-b on behalf of himself and the State of New Hampshire.

314.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW HAMPSHIRE:

  (1)    Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendant's conduct;

  (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Hampshire;

  (3)    Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XX – NEW JERSEY FALSE CLAIMS ACT

315.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

316.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*

317.    New Jersey False Claims Act, N.J.S.A. § 2A:32C-3, provides for liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

d. Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person

receives a certificate or receipt;

e. Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

f. Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

g. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

318.    In addition, N.J.S.A. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

319.    Defendant violated the New Jersey False Claims Act by engaging in the conduct alleged herein.

320.    Defendant further violated the New Jersey False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and N.J.S.A. § 30:4D-17, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

321.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

322.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and, upon information and belief, also an express

condition of payment of claims submitted to the State of New Jersey in connection with

Defendant's conduct. Compliance with applicable New Jersey statutes, regulations and

Pharmacy Manuals was also an express condition of payment of claims submitted to the State of

New Jersey.

323. Had the State of New Jersey known that Defendant was violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by

healthcare providers and third-party payers in connection with that conduct.

324. As a result of Defendant's violations of the New Jersey False Claims Act, the

State of New Jersey has been damaged in an amount far in excess of millions of dollars,

exclusive of interest.

325. Plaintiff-Relator is a private citizen with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to the New Jersey False

Claims Act on behalf of himself and the State of New Jersey.

326. This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF NEW JERSEY:

(1)    Three times the amount of actual damages which the State of New Jersey
has sustained as a result of Defendant's conduct;

84

(2)    A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of New Jersey;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXI – NEW MEXICO MEDICAID FALSE CLAIMS ACT

327.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

328.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*, which provides, in pertinent part, as follows:

A person shall not:

(1)    knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;

(2)    knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3)    conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim ....

85

329.    In addition, N.M. Stat. Ann. §§ 30-44-7 *et seq.* prohibits the solicitation or receipt

of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or

covertly, in cash or in kind, in return for furnishing any item or service for which payment may

be made in whole or in part, under the New Mexico Medicaid program.

330.    Defendant violated N.M. Stat. Ann§§ 30-44-7 *et seq.* by engaging in the conduct

alleged herein.

331.    Defendant further violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and knowingly

caused hundreds of thousands of false claims to be made, used and presented to the State of New

Mexico by its deliberate and systematic violation of federal and state laws, including the FDCA

and federal AKA, and by virtue of the fact that none of the claims submitted in connection with

its conduct were even eligible for reimbursement by the Government-funded healthcare

programs.

332.    The State of New Mexico, by and through the New Mexico Medicaid program

and other state healthcare programs, and unaware of Defendant's conduct, paid the claims

submitted by healthcare providers and third-party payers in connection therewith.

333.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and, upon information and belief, also an express

condition of payment of claims submitted to the State of New Mexico in connection with

Defendant's conduct.  Compliance with applicable New Mexico statutes, regulations and

Pharmacy Manuals was also an express condition of payment of claims submitted to the State of

New Mexico.

334.    Had the State of New Mexico known that Defendant was violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

335.    As a result of Defendant's violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

336.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* on behalf of himself and the State of New Mexico.

337.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW MEXICO:

(1)    Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Mexico;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXII – NEW YORK FALSE CLAIMS ACT

338.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

339.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, State Finance Law § 189, which imposes liability on any person who:

(a)    knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government; or

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

340.    In addition, New York law prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made, in whole or in part, under the New York Medicaid program.

341.    Defendant violated New York law by engaging in the conduct alleged herein.

342.    Defendant further violated the New York State False Claims Act, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws, including the FDCA

and federal AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

343.   The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

344.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendant's conduct.  Compliance with applicable New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New York.

345.   Had the State of New York known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

346.   As a result of Defendant's violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

347.   Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the New York State False Claims Act, on behalf of himself and the State of New York.

348.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW YORK:

(1)    Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

### COUNT XXIII – NORTH CAROLINA FALSE CLAIMS ACT

349.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

350.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.*

351. North Carolina's False Claims Act, N.C.G.S.A. § 1-607, provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

352. In addition, N.C.G.S.A. § 108A-63 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the North Carolina Medicaid program.

353. Defendant violated the North Carolina False Claims Act by engaging in the conduct alleged herein.

354. Defendant further violated the North Carolina False Claims Act, and knowingly

caused hundreds of thousands of false claims to be made, used and presented to the State of North Carolina, by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and N.C.G.S.A. § 108A-63, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

355.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

356.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendant's conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

357.    Had the State of North Carolina known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

358.    As a result of Defendant's violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

359.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to the North Carolina False

Claims Act on behalf of himself and the State of North Carolina.

360.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North
Carolina has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each
false claim which Defendant caused to be presented to the State of North
Carolina;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to North Carolina False Claims
Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred
in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIV – OKLAHOMA MEDICAID FALSE CLAIMS ACT

361.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

362.   This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False

Claims Act, 63 Okl. St. Ann. § 5053, *et seq.*

363.   Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for

liability for any person who:

1.   Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

3.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

4.   Has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

5.   Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

6.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, who lawfully may not sell or pledge the property; or

7.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

364.   In addition, 56 Okl. St. Ann. § 1005 prohibits the solicitation or receipt of any

remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind, in return for furnishing any item or service for which payment may be made in

whole or in part, under the Oklahoma Medicaid program.

365.   Defendant violated the Oklahoma Medicaid False Claims Act by engaging in the conduct alleged herein.

366.   Defendant furthermore violated the Oklahoma Medicaid False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and 56 Okl. St. Ann. § 1005, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

367.   The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

368.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendant's conduct.  Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

369.   Had the State of Oklahoma known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

370.   As a result of Defendant's violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

371.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of himself and the State of Oklahoma.

372.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma, in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

    (1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Oklahoma;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

    (1)    The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXV – RHODE ISLAND FALSE CLAIMS ACT

373.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

374.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of

Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims

Act, Gen. Laws 1956, § 9-1.1-1, *et seq.*

375.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for

liability for any person who:

   (1)    knowingly presents, or causes to be presented, to an officer or
          employee of the state a false or fraudulent claim for payment or
          approval;

   (2)    knowingly makes, uses, or causes to be made or used, a false
          record or statement to get a false or fraudulent claim paid or approved
          by the state;

   (3)    conspires to defraud the state by getting a false or fraudulent claim
          allowed or paid;

   (4)    has possession, custody, or control of property or money used, or
          to be used, by the state and, intending to defraud the state or willfully
          to conceal the property, delivers, or causes to be delivered, less
          property than the amount for which the person receives a certificate or
          receipt;

   (5)    authorized to make or deliver a document certifying receipt of
          property used, or to be used, by the state and, intending to defraud the
          state, makes or delivers the receipt without completely knowing that
          the information on the receipt is true;

   (6)    knowingly buys, or receives as a pledge of an obligation or debt,
          public property from an officer or employee of the state, or a member
          of the guard, who lawfully may not sell or pledge the property; or

   (7)    knowingly makes, uses, or causes to be made or used, a false
          record or statement to conceal, avoid or decrease an obligation to pay
          or transmit money or property to the state.

376.    In addition, Gen. Laws 1956, § 40-8.2-9 prohibits the solicitation or receipt of any

remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

377. Defendant violated the Rhode Island False Claims Act by engaging in the conduct alleged herein.

378. Defendant further violated the Rhode Island False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and Gen. Laws 1956, § 40-8.2-9, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

379. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

380. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

381. Had the State of Rhode Island known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by

healthcare providers and third-party payers in connection with that conduct.

382.    As a result of Defendant's violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

383.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of himself and the State of Rhode Island.

384.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVI – TENNESSEE FALSE CLAIMS ACT

385.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

386.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*

387.    Section 71-5-182(a)(1) provides liability for any person who-

(A)     presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(B)     makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; or

(C)     conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

388.    Defendant violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee by its deliberate and systematic violation of federal and state laws, including the FDCA and AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

389.    The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

390.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

100

condition of payment of claims submitted to the State of Tennessee in connection with

Defendant's conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy

Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

391.    Had the State of Tennessee known that Defendant was violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by

healthcare providers and third-party payers in connection with that conduct.

392.    As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the

State of Tennessee has been damaged in an amount far in excess of millions of dollars, exclusive

of interest.

393.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-

183(a)(1), on behalf of himself and the State of Tennessee.

394.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

    (1)    Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

101

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(5)    Such further relief as this Court deems equitable and just.

## COUNT XXVII – TEXAS FALSE CLAIMS ACT

395.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

396.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001, *et seq.*

397.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

(1)    knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:
(a) on an application for a contract, benefit, or payment under the Medicaid program; or
(b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.

(2) knowingly or intentionally concealing or failing to disclose an event:
(a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:
(i)    the person, or

(ii)     another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

(b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

* * *

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

* * *

(b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

398.    Defendant violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and § 36.002, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

399.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

400.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express

condition of payment of claims submitted to the State of Texas in connection with Defendant's conduct. Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

401.    Had the State of Texas known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

402.    As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

403.    Defendant did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

404.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

405.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF TEXAS:

(1)     Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum.. Res. Code § 36.025(a)(3) for each false claim which Defendant cause to be presented to the State of Texas;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVIII – VIRGINIA FRAUD AGAINST TAXPAYERS ACT

406.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

407.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act, §8.01-216.3a, which provides liability for any person who-

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a

claim by the commonwealth or

(3)     conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

* * *

(9)     is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

408.    In addition, VA Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made, in whole or in part, under the Virginia Medicaid program.

409.    Defendant violated VA Code Ann. § 32.1-315 by engaging in the conduct alleged herein.

410.    Defendant furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, VA Code Ann. § 32.1-315 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

411.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

412.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

413.    Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

414.    As a result of Defendant's violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

415.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of himself and the Commonwealth of Virginia.

416.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

107

(1)    Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIX - WASHINGTON MEDICAID FRAUD ACT

417.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

418.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, RCWA 74.66.005, *et seq*.

419.    RCWA 74.66.020 in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit one or more of the violations in this subsection (1).

420.    In addition, RCWA 74.09.240 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made, in whole or in part, under the Washington Medicaid program.

421.    Defendant violated RCWA 74.09.240 by engaging in the conduct described herein.

422.    Defendant furthermore violated the Washington Medicaid Fraud Act, RCWA 74.66.005, *et seq.*, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, and RCWA 74.09.240, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

423.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

424.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendant's conduct. Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

425.    Had the State of Washington known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

426.    As a result of Defendant's violations of the Washington Medicaid Fraud Act, RCWA 74.66.005, *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

427.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, RCWA 74.66.005, *et seq.* on behalf of himself and the State of Washington.

428.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to Washington Medicaid Fraud Act, RCWA 74.66.005, *et seq.* and/or any other applicable provision of law;

110

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXX – WISCONSIN MEDICAID FALSE CLAIMS ACT

429.     Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

430.     This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, W.S.A. § 20.931, *et seq.*

431.     The Wisconsin False Claims Act, W.S.A. § 20.931, *et seq.* provides for liability for any person who:

(a)     Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance;

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance;

(c)     Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program;

\* \* \*

(g)     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program; and/or

(h)     Is a beneficiary of the submission of a false claim for medical assistance to any officer, employee, or agent of this

> state, knows that the claim is false, and fails to disclose the false claim to this state within a reasonable time after the person becomes aware that the claim is false.

432. In addition, W.S.A. § 49.49 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Wisconsin Medicaid program.

433. Defendant violated the Wisconsin False Claims Act by engaging in the conduct alleged herein.

434. Defendant further violated the Wisconsin False Claims Act and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and W.S.A. § 49.49, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

435. The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

436. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with Defendant's conduct. Compliance with applicable Wisconsin statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Wisconsin.

437.    Had the State of Wisconsin known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

438.    As a result of Defendant's violations of the Wisconsin False Claims Act, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

439.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Wisconsin False Claims Act on behalf of himself and the State of Wisconsin.

440.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin, in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WISCONSIN:

(1)    Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Wisconsin;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Wisconsin False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXXI – D.C. PROCUREMENT REFORM AMENDMENT ACT

441.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

442.    This is a *qui tam* action brought by Plaintiff-Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13, *et seq.*

443.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, to an officer or employee of the District, a false claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

* * *

(8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

444.    In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

      (1)     Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

      (2)     Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

445.    Defendant violated D.C. Code § 4-802(c) by engaging in the illegal conduct alleged herein.

446.    Defendant further violated D.C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA D.C. Code § 4-802(c), and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government-funded healthcare programs.

447.    The District of Columbia, by and through the District of Columbia Medicaid program and other District of Columbia healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

448.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendant's illegal conduct.  Compliance with applicable D.C. statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the District of Columbia.

449.    Had the District of Columbia known that Defendant was violating the federal and

115

state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

450.    As a result of Defendant's violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

451.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

452.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the DISTRICT OF COLUMBIA:

(1)    Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to D.C. Code § 2-308.15(f)

116

and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just

## COUNT XXXII – CITY OF CHICAGO FALSE CLAIMS ACT

453.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

454.    This is a *qui tam* action brought by Plaintiff-Relator and the City of Chicago to recover treble damages and civil penalties under the Chicago False Claims Act, Chapter 1-22-10 *et seq*.

455.    The Chicago False Claims Act, Chapter 1-22-20, provides for liability for any person who:

(1)    knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city;

(3)    conspires to defraud the city by getting a false or fraudulent claim allowed or paid;

(4)    has possession, custody, or control of property or money used, or to be used, by the city and, intending to defraud the city or to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5)    authorized to make or deliver a document certifying receipt of property used, or to be used, by the city and, intending to defraud the city, makes or delivers the receipt without complete knowledge that the information on the receipt is

117

true;

(6)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the city who lawfully may not sell or pledge the property; or

(7)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city.

456.    Defendant violated Chicago False Claims Act, and further knowingly caused thousands of false claims to be made, used and presented to the City of Chicago by its deliberate and systematic violation of federal and state laws, including the FDCA and federal AKA, and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government-funded healthcare programs.

457.    The City of Chicago, by and through the City of Chicago Medicaid program and other state healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

458.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the City of Chicago in connection with Defendant's illegal conduct.  Compliance with applicable the City of Chicago statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the City of Chicago.

459.    Had the City of Chicago known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by

118

healthcare providers and third-party payers in connection with that conduct.

460.    As a result of Defendant's violations of the City of Chicago False Claims Act, has been damaged in an amount far in excess of millions of dollars exclusive of interest.

461.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Chicago False Claims Act on behalf of himself and the City of Chicago.

462.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the City of Chicago in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the CITY OF CHICAGO:

(1)    Three times the amount of actual damages which the City of Chicago has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the City of Chicago;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to the Chicago False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(3)    Such further relief as this Court deems equitable and just.

## COUNT XXXIII
## CITY OF NEW YORK FALSE CLAIMS ACT

463.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

464.    This is a *qui tam* action brought by Plaintiff-Relator and the City of New York to

recover treble damages and civil penalties under the New York City False Claims Act, Admin.

Code §7-801, *et seq*.

465.    New York City False Claims Act, Admin. Code §7-803, provides liability for any

person who:

> 1. knowingly presents, or causes to be presented, to any city officer
> or employee, a false claim for payment or approval by the city;
>
> 2. knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false claim paid or approved by the
> city;
>
> 3. conspires to defraud the city by getting a false claim allowed or
> paid by the city;
>
> 4. has possession, custody, or control of property or money used,
> or to be used, directly or indirectly, by the city and, intending to
> defraud the city or willfully conceal the property or money,
> delivers, or causes to be delivered, less property or money than the
> amount for which the person receives a certificate or receipt;
>
> 5. is authorized to make or deliver a document certifying receipt of
> property used, or to be used, directly or indirectly, by the city and,
> intending to defraud the city, makes or delivers the receipt without
> completely knowing that the information on the receipt is true;
>
> 6. knowingly buys, or receives as a pledge of an obligation or debt,
> public property from an officer or employee of the city knowing
> that such officer or employee lawfully may not sell or pledge the
> property; or
>
> 7. knowingly makes, uses, or causes to be made or used, a false
> record or statement to conceal, avoid, or decrease, directly or
> indirectly, an obligation to pay or transmit money or property to
> the city.

466.    Defendant furthermore violated the New York City False Claims Act, Admin. Code §7-803, and knowingly caused thousands of false claims to be made, used and presented to the City of New York by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government-funded healthcare programs.

467.    The City of New York, by and through the City of New York Medicaid program and other state healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

468.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the City of New York in connection with Defendant's illegal conduct.    Compliance with applicable the City of New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the City of New York.

469.    Had the City of New York known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

470.    As a result of Defendant's violations of New York City False Claims Act, Admin. Code §7-803 the City of New York has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

121

471.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to New York City False Claims Act, on behalf of himself and the City of New York.

472.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the City of New York in the operation of its Medicaid program.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the CITY OF NEW YORK:

(1)    Three times the amount of actual damages which the City of New York has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the City of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)    The maximum amount allowed pursuant to the New York City False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator demands a trial by jury on all Counts.

Dated: May 31, 2013                    Respectfully submitted,

*James J McEldrew III*

Eric L. Young, Esquire
James J. McEldrew, III, Esquire (JM-0120)
Brandon J. Lauria, Esquire
Young Law Group, P.C.
123 S. Broad Street, Suite 1920
Philadelphia, PA 19109
Tel: (215) 367-5151
Fax: (215) 367-5143


James E. Miller, Esquire
Laurie Rubinow, Esquire
Karen M. Leser-Grenon, Esquire
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT  06412
Tel: (860) 526-1100
Fax: (860) 526-1120
Email: jmiller@sfmslaw.com
          lrubinow@sfmslaw.com
          kleser@sfmslaw.com

John R. Mininno
Mininno Law Office
75 White Horse Pike
Collingswood, NJ 08107
Tel: (856) 833-0600
Fax: 856-810-9500
Email: jrm@minfirm.com

Counsel for Plaintiff-Relator

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served pursuant to Rule 4 of the

Federal Rules of Civil Procedure and the United States False Claims Act, as follows:

### Via Certified Mail, Return Receipt Requested

Eric C. Holder, Jr.
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
**Attn: False Claims Act Filing**


Preet Bharara
Office of the United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007

Dated:   May 31, 2013

James J. McEldrew, III, Esquire (JM-0120)
Young Law Group, P.C.
123 S. Broad Street, Suite 1920
Philadelphia, PA 19109
Tel: (215) 367-5151
Fax: (215) 367-5143